IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GREGORIA MARQUEZ,

    Plaintiff,

v.

HARBORVIEW MEDICAL CENTER,

    Defendant.

Case No. C16-1450RSM

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter comes before the Court on Defendant's Motion for Summary Judgment. Dkt. #19. Defendant seeks dismissal of all of Plaintiff's claims, asserting that the evidence in the record demonstrates a legal basis for Plaintiff's employment termination. *Id.* Plaintiff essentially responds that too many issues of material fact preclude summary judgment. Dkt. #21. For the reasons set forth below, the Court disagrees with Plaintiff, and GRANTS Defendant's Motion for Summary Judgment.

## II. BACKGROUND

This is an employment action in which Plaintiff raises claims for age discrimination, defamation, violation of Washington State's Employee Whistleblowing Protection Act, negligent investigation (breach of contract), and violation of 42. U.S.C. § 1983. Dkt. #1-2 at ¶ ¶ 5.1-5.2[5].

ORDER– 1

Plaintiff, Gregoria Marquez, worked at Harborview for over 43 years, starting in a permanent capacity on August 31, 1970. Dkts. #1-2 at ¶ 4.1 and #2-3 at 9. From January 1, 2007, to her termination in 2014, she held the position of Patient Service Specialist II on the Medicine/Telemetry Unit, 3 East Hospital. *Id.* That position is administrative in nature, and involves coordination of clerical and support activities for patient care on a nursing unit, answering the phones, responding to patient call lights, receiving patients and visitors to the unit, and facilitating contact between patients, their families, and appropriate personnel. *Id.* at pp.12-14.

Several years prior to her termination, in May 2011, Plaintiff complained to the Harborview Human Resources Department that another employee had not accurately reported her time on her timesheets. Dkt. #2-2 at 51, lns. 2-7. An Internal Audit Department investigation revealed that Plaintiff's allegations had merit. *Id*. at 54, lns. 15-18. As a result, the employee received a final counseling. Dkt. #2-3 at 3, ¶ 5. The employee was also required to repay the money she had been erroneously overpaid. *Id.* The matter was then closed.

In early 2013, Theresa Valdez, a part-time Hospital Assistant who worked in the same area as Plaintiff, made a comment in front of several other employees that Plaintiff had copies of other employees' schedules in her car. Dkt. #2-2 at 72, ln. 10–73, ln. 10. Laura Newcomb, Nurse Manager, Patient Services, learned of this comment and asked Ms. Valdez for more information about the documents in Plaintiff's vehicle.[1] Dkt. #2-3 at 3, ¶ 6. Ms.

---

[1] Ms. Valdez has testified that she did not report Plaintiff to Ms. Newcomb for time card violations; however, she confirms that she told Ms. Newcomb about employee schedules that were in Plaintiff's car when Ms. Newcomb asked her about it. Dkt. #21-3 at 18:11-19:13.

ORDER– 2

Newcomb also scheduled an interview with Plaintiff. *Id.* at 50. In a letter dated March 8, 2013, Ms. Newcomb notified Plaintiff of the interview, and included the following language:

> I have attached the University of Washington's "Complaints Against University Employees" Administrative Policy Statement (46.3) to this notice. Please review the policy statement to gather information regarding complaint investigation and expectations regarding non-retaliation. It is my expectation that you will keep the allegations confidential and not discuss the matter with your fellow employees. It's important that I caution you that confronting fellow employees with these allegations may be reasonably perceived as retaliation. Engaging in retaliatory behavior will result in corrective action, up to and including dismissal.

Dkt. #2-3 at 50 (underline in original). Human Resource Consultant Nora Balch, who assisted in drafting this letter, states that she frequently uses this quoted language because it gives employees practical advice regarding what constitutes retaliation and helps them to be successful in complying with the policy. Dkt. #2-2 at 55, ln. 6–56, ln. 14. Plaintiff has admitted receiving the letter and understanding the language. Dkt. #2-2 at 87, lns. 1-14.

Ms. Newcomb and Ms. Balch met with Plaintiff to discuss the issue on March 15, 2013. Dkt. #2-3 at 68, ¶ 2. Plaintiff's union representative, Ray Trice, was also present. *Id.* After that meeting, Ms. Newcomb and Ms. Balch determined no further investigation or action was necessary. *Id.* and Dkt. #2-2 at 67, ln. 5–68, ln. 6. They notified Plaintiff that there would be no further action related to this issue. *Id.* Ms. Balch also informed Plaintiff that she was not to engage in any form of retaliation, including contacting other employees to find out more information, in order to "preserve workplace relationships" and avoid interrupting investigations. She further informed Plaintiff that she should work with her Union Representative, Human Resources, or her manager if she had questions or concerns about the non-retaliation policy or the investigatory process. Dkt. #2-2 at 57-59.

ORDER– 3

Despite that directive, Plaintiff confronted her coworkers in an effort to find out who had "turned her in." Maria Gonzaga reported to Ms. Newcomb that Plaintiff called her and said, "Maria tell me the truth, are you the one who told [] Laura regarding the copied papers in my car?" Dkt. #2-3 at 3, ¶ 8 and Ex. F thereto. When Ms. Gonzaga denied that she had reported Plaintiff, Plaintiff apparently stated, "It's Theresa then," referring to Ms. Valdez. *Id.* Plaintiff then approached Ms. Valdez. In an email describing the incident, Ms. Valdez wrote:

> [Plaintiff] told me in a loud voice, "you turned me in to Laura" and then she started confronting me about the details of a said meeting in HR. . . . [W]hen I denied it she then accused me of [being] the only person who has rid[d]en in her car. . . . I was so terrified of what was happening because [I] have no idea about the meeting. I again denied her allegations and told her I don't know who told Laura. She then asked me "swear on your mother's grave[.]" I was so afraid of her that I said, "ok, I swear" then she made me raise my hand in [] front of her and said []"say it again[.]"

Dkts. #2-3 at 3, ¶ 8 and Ex. G thereto and #2-2 at 74, lns. 6-23. Plaintiff admits that she confronted both Ms. Valdez and Ms. Gonzaga, but denies that the conversations were threatening in any way. Dkt. #2-2 at 88-91.

Ms. Newcomb and Ms. Balch interviewed Plaintiff regarding her coworkers' allegations that she had threatened them on March 29, 2013. Dkt. #2-3 at 4, ¶ 9. Plaintiff was accompanied by a union representative. *Id.* In that meeting, Plaintiff admitted to speaking to Ms. Valdez and Ms. Gonzaga, although she again denied that she was threatening in any way. *Id.* at 16-19. As a result, on May 8, 2013, Ms. Newcomb issued a Final Counseling to Plaintiff. *Id.* Ms. Newcomb informed Plaintiff that her behavior was "retaliatory and disrespectful" and "in direct violation of the directive given to [her]." *Id.* Ms. Newcomb also stated the behavior violated the UW Policy on Complaints, the UW

ORDER– 4

Complaints Process, and Harborview's Professional Conduct Policy, and enclosed the referenced policies. Dkt. #2-3 at 18-19. Plaintiff was instructed to "abide by HMC's Professional Conduct policy and not engage in unprofessional behavior that includes, but is not limited to retaliatory, threatening, disrespectful or disruptive behavior." *Id.*

On May 21, 2013, Ms. Newcomb provided Plaintiff with a Final Counseling Action Plan. *Id.* at 20. She was again directed to comply with the referenced policies. *Id.* For example, she was instructed "not [to] approach other employees regarding their involvement in complaint processes or investigations. Confronting other employees to determine 'what they know' can be perceived as retaliation and is disruptive to the work environment." *Id.* She was also warned that "[f]ailure to improve in the above areas may result in further corrective action up to and including dismissal." *Id.* Plaintiff signed the document, indicating she had reviewed it.[2] *Id.*

Following the Final Counseling, employees continued to report negative interactions with Plaintiff. Ms. Gonzaga complained to Ms. Newcomb that Plaintiff had mimed scratching out Ms. Gonzaga's picture (an action the two had previously discussed as having the ability to actually harm a person), had been speaking negatively about her to other

---

[2] After receiving her Final Counseling, Plaintiff filed a complaint and a grievance complaining about Ms. Newcomb's treatment of her, including with regard to overtime and vacation time. Dkt. #2-3 at 68-69, ¶ 3. Ms. Balch referred the complaint to Jon Payne, an investigator at UW Medicine Human Resources. Dkt. #2-2 at 60, ln. 12-63, ln. 4 and #2-3 at 79-80, ¶ ¶ 2-3. Mr. Payne conducted an investigation, finding a valid basis for Plaintiff's negative performance feedback. Dkt. #2-3 at 80. Plaintiff disagrees that Mr. Payne conducted an unbiased investigation, Dkt. #21 at 10-11, but subsequently withdrew her grievance. In February 2014, Plaintiff submitted another complaint about Ms. Newcomb to the University's Complaint Investigation and Resolution Office. Dkt. #2-3 at 89, ¶ 3. Ian Messerle of that office investigated her complaint, eventually expanding its scope to include her termination as well. *Id.* at 89-90, ¶ 4. Mr. Messerle concluded there was "insufficient evidence to support the conclusion that Ms. Newcomb's actions were the result of age discrimination." *Id.* at 90, ¶ 5 and 93-98.

ORDER– 5

employees, and had accused Ms. Gonzaga of making the complaints that led to Plaintiff's Final Counseling. Dkt. #2-3 at 4, ¶ 10 and 21. Ms. Gonzaga told Ms. Newcomb she was fearful of Plaintiff. *Id.* Dorothy Padilla, whom Plaintiff had previously reported for timecard issues, complained to Human Resources that Plaintiff was harassing her: "Gregoria Marquez has made my life miserable and won't stop until she gets rid of me. I feel that this person has such an agenda against me and it had become more of hostile and harassment towards me." Dkt. #2-3 at 74 ([sic] throughout) and 21-22.

Ms. Newcomb and Ms. Balch investigated these allegations, and interviewed Plaintiff. Dkt. #2-3 at 4, ¶ 11. After the interview, Plaintiff telephoned a new employee, Laura Vo, at home to discuss a scheduling issue. *Id.* at 4, ¶ 12 and 26-27. During that conversation, Plaintiff described Maria Gonzaga as a "snake" and a "brown-noser" and Dorothy Padilla as a "thief." *Id.* and Dkt. #2-2 at 97, ln 12–99, ln. 20. Plaintiff also asked Ms. Vo not to tell anyone about their conversation because she did not want it to "blow out of proportion." *Id.* at 99, lns. 19-22. Ms. Vo sent Ms. Newcomb an email about this conversation:

> Greg . . . warned me to watch out for [Maria Gonzaga] because she (Maria) was a, "snake, a brown-noser and would double cross me." . . . Greg then began to launch into [a] lengthy tirade against Dorothy Padilla, Management and fraudulent behavior. . . . Further along in the conversation she came to talking about what a snake Maria, the HA, was, and how the HA's and CMT's were either not competent, lazy or shirked their duties in some way. . . . At this point I was completely exhausted from the conversation, and tried to end it when she recapped on everything she covered, reminded me to call Staffing and informed me that she didn't want me to tell anyone because she would get fired.

Dkt. #2-3 at 26-27.

As a result, on February 25, 2014, Harborview placed Plaintiff on paid administrative leave "pending a recommendation for [her] dismissal." Dkt. #2-3 at 28. That evening,

ORDER– 6

around 9:00 p.m., Plaintiff went (uninvited) to the home of Ms. Valdez. *Id.* at 4, ¶ 13 and 24. She stayed for two hours talking about her employment situation. Dkt. #2-3 at 24. A few days later, Plaintiff asked Ms. Valdez to write a statement supporting her, but Ms. Valdez declined. Dkt. #2-3 at 24. According to Ms. Valdez, Plaintiff became very upset. *Id.* However, shortly thereafter, Plaintiff called Ms. Valdez and told her not to worry about writing a statement because she (Plaintiff) had drafted one for Ms. Valdez to sign. Dkt. #2-3 at 24.

Ms. Valdez reported both the visit and the statement to Ms. Newcomb, who asked her to provide a written account of what happened. Dkt. #2-3 at 4, ¶ 13. On March 13, 2014, Ms. Valdez emailed Ms. Newcomb, stating that she was writing for "her own protection":

> I got home around 2145 and as soon as we got in the house the phone was ringing continuously. I answered and it was Gregoria saying, "[] I'm sorry Theresa to be doing this to you, I'm really sorry, but you have to get out of your house and meet me", I'm already here outside your driveway[.]" I immediately walked out of my house, then realized, "oh no did she found out I was in HR? I was worried will she shoot me? (exaggerated as it may seem, but I was nervous for my safety, I didn't know what she's capable of doing) . . . .
>
> Since that Monday night Gregoria has been calling me everyday. It became a nuisance already to the point that I would put our phone off, she would call and leave annoying messages. . . .
>
> Last Sunday I came home @ 2200. She called and I talked with her. She told me . . . she needed a statement from me . . . . . I told her that I don't feel comfortable doing such a thing . . . . She became very defensive and started raising her deep voice. She accused me of "so maybe you're the one who told lies about me, you probably said something damaging about me, why don't you want to write a statement. . . .
>
> Tuesday @2230 She called me again. (this is after so many missed calls and messages) she had a different tone and was very calm. She told me "huy don't worry about the statement, I made one for you I even typed it up" I was beyond words and I asked her to read it to me, she said can I

ORDER– 7

> come over and you just have to sign it?" She read the statement that she wrote, and I didn't like it at all.
>
> . . .
>
> Since that day that I heard her talk really mad at me, I am feeling frightened because she might focus her firing or leave at me. I'm afraid she would be at my doorstep, I now park my car inside the garage, I don't even turn on our room lights to make it seem like I'm not home. Our phone is being screened now, I became afraid of my own house. I always look around to see if she's there.
>
> This is the reason I came to you to ask for help, I'm tired of being afraid.

Dkt. #2-3 at 62-64 ([*sic*] throughout). Ms. Valdez has testified that she drafted the email soon after the events, while they were fresh in her mind, and that she was truthful in what she wrote. Dkt. #2-2 at 75, lns. 1-16.

Ms. Newcomb interviewed Plaintiff regarding Ms. Valdez's email. Dkt. #2-3 at 5, ¶ 14. Ms. Balch and Plaintiff's union representative were also present. *Id.* During the interview, Plaintiff repeatedly referred to Ms. Valdez as "two-faced" and stated, "If I am guilty and I go down, they'll all go down too. I'm not going down alone. I've prepared myself for that." *Id.* and Dkt. #2-2 at 100, lns. 12-19.

Ms. Newcomb determined that termination was appropriate. Dkt. #2-2 at 9-11. In her recommendation for dismissal to Johnese Spisso, Harborview's Interim Executive Director, Ms. Newcomb wrote that Plaintiff had "exhibited a continued pattern of behavior that violates the provisions of non-retaliation as described in the UW Resolution of Complaints Policy." *Id.* She also wrote that Plaintiff's behavior "is entirely at odds with HMC's Professional Conduct Policy [], which defines as unprofessional any behavior that includes, but is not limited to: retaliatory, threatening, disrespectful and disruptive in nature." *Id.*

ORDER– 8

Ms. Balch notified Plaintiff of the recommendation on March 20, 2014. Dkt. #2-3 at 69, ¶ 5 and 77. She enclosed the recommendation for dismissal and its attachments, and she scheduled a pre-determination meeting for Friday, March 28, 2014, with herself and Kathy Hare, Assistant Administrator for Harborview Medical Center. Dkt. #2-3 at 69, ¶ 5 and 77. Plaintiff attended the pre-determination meeting with her Union Representative, Anne-Marie Cavanaugh. Dkt. #2-3 at 69, ¶ 6. Both Plaintiff and Ms. Cavanaugh spoke in Plaintiff's defense. *Id.* Following the meeting, Plaintiff submitted letters of support from four of her former colleagues. *Id.* at 69-70, ¶ 7. Ms. Balch received and reviewed those letters, and also provided them to Ms. Hare and to Darcy Jaffe, Harborview's Associate Administrator and Chief Nursing Officer. *Id.* Ultimately, Ms. Spisso approved the recommendation to terminate Plaintiff. Dkt. #2-3 at 66.

After her termination, Plaintiff filed a grievance with her union. However, the union did not support the grievance. "In this instance, the Committee found that based on the evidence presented, the employer met its burden of just cause under Article 23 to impose the discipline." Dkt. #2-2 at 101-102 and 105.

While Plaintiff objects to the characterization by Defendants of these events, she largely concurs that the events occurred. Dkts. #21 at 2-4 and 9-11 and #22. However, Plaintiff asserts that she was targeted based on her age. *See* Dkt. #22. In support of that contention, she relies on the testimony of Constance Smith, a supervisory nurse at Harborview Medical Center. Dkt. #21 at 4-6. Ms. Smith stated that she felt there had been more scrutiny on Plaintiff's performance, but she was not sure why. Dkt. #21-1 at 15:-16:22. Ms. Smith also testified that she believed Ms. Newcomb was anxious to see

Plaintiff retire, but again, she was not really sure why. *Id.* at 18:20-19:15. She speculated that it may have had to do with Plaintiff's time card complaint. *Id.* at 19:10-15.

### III. DISCUSSION

#### A. Legal Standard on Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (*citing Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)). Material facts are those which might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 251.

#### B. Age Discrimination

Plaintiff first alleges a state law claim for age discrimination under Washington's Law Against Discrimination ("WLAD"), RCW 49.60, *et seq.* Dkt. #1-2 at ¶ ¶ 5.1-5.5. The

ORDER– 10

WLAD protects employees age 40 and over from discrimination on the basis of age. RCW §§ 49.44.090 and 46.60.180. Under the *McDonnell Douglas* framework, Washington courts use a burden shifting analysis in cases alleging employment discrimination under the WLAD. *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cty.*, 189 Wn.2d 516, 527, 404 P.3d 464 (2017); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973). The plaintiff has the initial burden of proving a *prima facie* case, which creates a presumption of discrimination. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 446, 334 P.3d 541 (2014). The burden then shifts to the defendant who must present evidence that the plaintiff was terminated for a legitimate and nondiscriminatory reason. *Id.* The plaintiff must then show that the proffered reason is a pretext for discrimination. *Id.* "Evidence is sufficient to overcome summary judgment if it creates a genuine issue of material fact that the employer's articulated reason was a pretext for a discriminatory purpose." *Id.* (citations omitted). The Washington Supreme Court has noted that "[s]ummary judgment for an employer is seldom appropriate in employment discrimination cases because of the difficulty of proving discriminatory motivation." *Mikkelson*, 189 Wn.2d at 527-28 (citing *Scrivener*, 181 Wn.2d at 445). A plaintiff may overcome summary judgment merely by showing "that a reasonable jury could find that discrimination was a substantial factor in the employer's adverse employment action." *Id.* (citation omitted).

As an initial matter, the Court finds that Plaintiff has made a *prima facie* case creating a presumption of discrimination. Plaintiff has demonstrated that she was within the statutorily protected age group (she is over the age of 40); she was discharged by

ORDER– 11

Defendants, and Defendants do not dispute that she was doing satisfactory work.[3] *Mikkelson*, 189 Wn.2d at 527. However, the Court also finds Defendant has demonstrated that Plaintiff was terminated for a legitimate, non-discriminatory reason. Indeed, Plaintiff admits to confronting co-workers after she was directed not to, and admits that she was informed about the reasons behind the directive. While she disagrees with the characterization of her interactions with those co-workers, the record reflects several emails to Ms. Newcomb by those co-workers who expressed fear by the hostility shown to them. Thus, the burden shifts back to Plaintiff to raise material facts upon which a jury could find that discrimination was a substantial factor in her termination. On this record, Plaintiff is unable to make such a showing.

An employee can show that the employer's stated reasons for termination are pretextual and unworthy of belief "with evidence that: (1) the employer's reasons have no basis in fact; or (2) even if the reasons are based on fact, the employer was not motivated by the reasons; or (3) the reasons are insufficient to motivate the adverse employment decision." *Chen v. State*, 86 Wash. App. 183, 190, 937 P.2d 612 (1997). Pretext may also be demonstrated by evidence showing that an employee was treated differently than similarly situated employees. *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003). Circumstantial or inferential evidence may be sufficient to establish pretextual motive, *Mikkelsen*, 189 Wash.2d at 526, however, an employee's subjective belief about his performance is not relevant, *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 660 (9th Cir. 2002) (citing *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir.

---

[3] Defendants do assert that Plaintiff "struggled with proper workplace communication and was the subject of several patient and co-worker complaints," but acknowledge that "a full

ORDER– 12

1996)). If there is no evidence of pretext the defendant is entitled to dismissal as a matter of law, but if there is evidence of pretext then the case must go to the jury. *See Kastanis v. Educ. Employees Credit Union*, 122 Wash.2d 483, 490, 859 P.2d 26 (1993).

The only evidence that Plaintiff produces in support of her assertion that she was terminated because of her age is the testimony of Ms. Smith and Ms. Valdez. Dkt. #21 at 18. As noted above, Ms. Smith merely speculates that Ms. Newcomb wanted Plaintiff to retire. It is Ms. Smith who uses the words "new blood," not a phrase that she overheard someone else using, and Ms. Smith admits that she really does not know why anyone would want Plaintiff to retire. Ms. Smith also testified that she could remember no specific comments that anyone made regarding any reasons that Defendants would want Plaintiff to retire. Dkt. #21-1 at 20:8-11. Ms. Smith speculates that Plaintiff may have been treated differently because she did not perform cardiac monitor technician duties. Dkt. #21-1 at 20:16-21:24. Yet, again, Ms. Smith makes clear that she had not heard that herself. Dkt. #21-1 at 20:17-18. Ms. Valdez merely observed that sometimes the charge nurse "watched" Plaintiff more carefully and held her to 15 minute breaks. Dkt. #21-3 at 20:25-22:16. Notably, neither Ms. Smith nor Ms. Valdez make clear that Plaintiff was treated differently from anyone <u>similarly situated</u> to her.[4]

Nothing about this testimony suggests that Plaintiff was terminated because of her age, and no reasonable jury could find otherwise given the abundant evidence provided by Defendants demonstrating the warnings and counseling provided to Plaintiff prior to her termination, Plaintiff's own admissions to the conduct leading to her termination, and the

---

discussion" of Plaintiff's job performance "is beyond the scope of this motion." Dkt. #19 at 2.

ORDER– 13

notice from Plaintiff's union finding that Defendants had met the standard for just cause termination. For these reasons, the Court will dismiss Plaintiff's age discrimination claim.

## C. Defamation

Plaintiff next makes a claims for defamation. Dkt. #1-2 at ¶¶ 5.6-5.10. To succeed on a claim for defamation, a plaintiff must prove four elements: (1) a false statement, (2) publication, (3) fault, and (4) damages. *Duc Tan v. Le*, 177 Wn.2d 649, 662, 300 P.3d 356 (2013), *cert. denied*, 134 S. Ct. 941 (2014). When a defendant in a defamation action moves for summary judgment, the plaintiff has the burden of establishing a *prima facie* case on all four elements. *LaMon v. Butler*, 112 Wn.2d 193, 197, 770 P.2d 1027 (1989). The *prima facie* case must consist of specific, material facts, rather than conclusory statements, that would allow a jury to find that each element of defamation exists. *Id*. (*citing Herron v. Tribune Pub'g Co.*, 108 Wb.2d 162, 170, 736 P.2d 249 (1987)).

Plaintiff entirely fails to support this claim. First, Plaintiff fails to identify what statements were defamatory. Plaintiff has presented contradictory reasons for this claim. First, she suggests in her motion that the defamatory communication was the "false" basis of her termination – retaliation toward other employees. Dkt. #21 at 19. However, that contradicts Plaintiff's deposition testimony that two co-workers defamed her by reporting that she retaliated against them.[5] Dkt. #2-2 at 79, lns 3-12.

Regardless, if any of those "statements" were the basis of her claim, and even if those statements were demonstrably false, there is no "publication" of those statements in

---

[4] Further, Plaintiff presents no evidence to rebut the interactions reported by Ms. Gonzaga and Ms. Vo.

[5] Notably, Plaintiff has not named any individual Defendants in this lawsuit, and provides no legal authority providing that Defendant could be liable for her co-worker's allegedly false reports.

ORDER– 14

this case. Plaintiff asserts that the allegedly false basis for her termination was communicated to Ms. Valdez. Dkt. #21 at 19. As this Court has explained in prior decisions, such communications are privileged under Washington law. Washington courts have consistently held that intra-corporate communications are not considered published for purposes of a defamation claim when the statements are made within the "limits of their employment." *Doe v. Gonzaga Univ.*, 143 Wn.2d at 702, 24 P.3d 390 (citing *Prins v. Holland-North Am. Mortgage Co.*, 107 Wn. 206, 208, 181 P. 680 (1919)). This is because the entity is essentially communicating with itself. *See id.* at 701. Thus, communications made only among corporate personnel as part of the ordinary course of employment are privileged and not "published" for purposes of defamation. *See Doe v. Gonzaga University*, 99 Wn. App. 338, 348, 992 P.2d 545 (2000), *reversed on other grounds, Gonzaga University v. Doe*, 536 U.S. 273, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002); *Woody v. Stapp*, 146 Wn. App. 16, 21, 189 P.3d 807 (2008); *Prins v. Holland-North America Mortg. Co.*, 107 Wn. 206, 208, 181 P. 680, 680 (1919). This rule shields individual employees as well as the corporation itself. *See Doe*, 99 Wn. App. at 348 (noting that, "after all, the corporation can speak to itself only through the individuals who work for it.").

For all of these reasons, Plaintiff fails to make a *prima facie* case of defamation, and the Court will dismiss Plaintiff's claim.

**D. Washington State's Employee Whistleblowing Act**

Plaintiff next makes a claim for violation of Washington's Employee Whistleblowing Act, RCW 42.40, *et seq.* Dkt. #1-2 at ¶ ¶ 5.11-5.14. RCW 42.40.050 and RCW 49.60.210(2) prohibit retaliation against a whistleblower. To establish a *prima facie*

ORDER– 15

case of retaliation, an employee must show that (1) she engaged in a statutorily protected activity (filing a whistleblower complaint), (2) the employer took an adverse employment action, and (3) the adverse action was caused by the employee's activity. *Milligan v. Thompson*, 110 Wn. App. 628, 638, 42 P.3d 418 (2002).

Plaintiff alleges that she was terminated in part because of her complaint about an employee falsifying time sheets. However, Plaintiff again fails to produce any evidence supporting her contention. Indeed, Plaintiff made her complaint in 2011, three years prior to her termination, and the University took disciplinary action against that employee. Dkts. #2-2 at 51-52 and #2-3 at 3, ¶ 5. There is no evidence of a connection between that activity and the 2014 termination based on Plaintiff's retaliatory conduct toward her co-workers. Accordingly, the Court will dismiss this claim.

### E. Wrongful Discharge/Retaliation

Plaintiff next makes a claim for "wrongful discharge/retaliation." Dkt. #1-2 at ¶ ¶ 5.15-5.17. The bases of this claim appear to be duplicative of the claims addressed above. *Id.* Accordingly, the Court will dismiss this claim for the same reasons.

### F. Negligent Investigation (Breach of Contract)

Plaintiff next makes a claim for negligent investigation (breach of contract. Dkt. #1-2 at ¶ ¶ 5.18-5.21. It appears that Plaintiff bases this cause of action on her Collective Bargaining Agreement, which provides that she may only be terminated for "just cause." *Id.* As best as this Court can interpret, she alleges that because Defendants conducted a sham investigation into her alleged retaliation against co-workers, the resulting termination was not for "just cause," and therefore her termination constituted a breach of contract. *Id.* Washington State does not recognize a tort claim for negligent investigation in the

ORDER– 16

employment context. *Lambert v. Morehouse*, 68 Wn. App. 500, 505, 843 P.2d 1116, 1119 (1993) ("As a matter of policy, we conclude that tort liability for negligent investigation is equally inappropriate in the employment relationship."). Moreover, Plaintiff's own union found that Defendant had met the just cause standard. Accordingly, this claim will be dismissed.

### G. Violation of 42 U.S.C. § 1983

Finally, Plaintiff brings a claim for violation of her civil rights pursuant to 42 U.S.C. § 1983, premised on an alleged violation of her First Amendment free speech rights. Dkt. #1-2 at ¶ ¶ 5.22-5.24[sic]. As an initial matter, the Court notes that Plaintiff has named only one Defendant in this lawsuit – Harborview Medical Center. Dkt. #1-2 at ¶ 2.2. 42 U.S.C. § 1983 applies to the actions of "persons" acting under color of state law. It is well-settled law that for the purposes of § 1983, a state is not a "person." *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 69, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). Likewise, an agency that is an arm of the state is also not a "person" under § 1983. *See Howlett v. Rose*, 496 U.S. 356, 365, 110 S. Ct. 2430, 110 L. Ed. 2d 332 (1990); *also Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 57 L. Ed. 2d 1114 (1978) (per curiam) (concluding that the suit against the state Board of Corrections was barred by the Eleventh Amendment). Harborview Medical Center is considered under Washington law to be a state agency:

> . . . Harborview is operated and managed by the University of Washington and all of its employees are employees of the University. *See also* RCW 36.62.290. Because the University of Washington is a state agency, Harborview, as operated and managed by the University, is an arm of the state. . . . It is clear that, in the context of this case, a §

ORDER– 17

> 1983 suit against Harborview is in legal effect a suit against the State and cannot, therefore, be maintained.

*Hontz v. State*, 105 Wash. 2d 302, 309–10, 714 P.2d 1176, 1180 (1986).

Plaintiff's arguments to the contrary are unpersuasive. Plaintiff relies on two inapplicable state statutes in an effort to further her claim. Dkt. #21 at 20-22. She asserts that, under these statutes (RCW 4.92.090 and 28B.20.250 and .253), Defendant has waived immunity. *Id.* Plaintiff misconstrues these statutes.

In *Rains v. State,* the Washington Supreme Court affirmed its position that "the State is not suable under section 1983 for acts of its agents subjecting the plaintiff to deprivation of his civil rights." 100 Wash.2d 660, 666, 674 P.2d 165, 170 (1983) (citing *Edgar v. State*). The *Rains* court noted that the remedy for alleged deprivation of civil rights by agents of the state would be to sue the individuals who committed the alleged acts; and concluded: "[w]e can find nothing in the legislative history nor in the legislation to indicate the Legislature also intended the State could be sued." *Id.* at 668; 170. Further, in *Skokomish Indian Tribe v. France*, the Ninth Circuit Court of Appeals concluded that through RCW 4.92.090, the state waived immunity to suit in state court, but not immunity from federal claims in federal court. 269 F.2d 555, 560–61 (9th Cir. 1959).

Likewise, neither RCW 28B.20.250 or .253 waive the State's immunity. These statutory provisions focus on liability coverage to University of Washington personnel and students in certain circumstances. For all of these reasons, the Court will dismiss Plaintiff's claim.

# IV. CONCLUSION

Having reviewed Defendant's Motion for Summary Judgment, the Opposition thereto and Reply in support thereof, along with the supporting Declarations and Exhibits and the remainder of the record, the Court hereby finds and ORDERS:

1. Defendant's Motion for Summary Judgment (Dkt. #19) is GRANTED, and all claims against Defendant are DISMISSED with prejudice for the reasons discussed above.

2. This matter is now CLOSED.

DATED this 7 day of February, 2018.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER– 19